## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**SUSAN A. STENDER,**

        Plaintiff,

    v.

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

        Defendant.

Civil No. 04-4491 (JRT/JGL)

**REPORT AND**
**RECOMMENDATION**

---

### APPEARANCES

Fay E. Fishman, Esq., on behalf of Plaintiff Susan A. Stender

Lonnie F. Bryan, Esq., Assistant U.S. Attorney, on behalf of Defendant Jo Anne B. Barnhart

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

       Plaintiff Susan A. Stender commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1(a). The parties have submitted cross-motions for summary judgment. For the reasons set forth below, the Court recommends that the Commissioner be affirmed.

## I.   INTRODUCTION

Plaintiff Susan A. Stender was thirty-four years old at the time of the decision by the Administrative Law Judge ("ALJ").  (R. at 16.)  She is married and has two dependent children.  (Id. at 109.)  Stender applied for DIB on August 1, 2002, alleging disability since June 30, 1997 due to multiple sclerosis ("MS"), weakness, fatigue, pains in her legs and neck, and depression.  (Id. at 109-111, 122.)  For social security disability purposes, her date last insured was December 31, 2002.  (Id. at 118.)  To be successful in her present claim for DIB, Stender concedes that she must establish that she has a disability that began on or before the date her insurance expired.  (Pl.'s Mem. Supp. Mot. Summ. J. at 2); see also Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir. 1995).

Plaintiff's disability application was denied by the state agency both initially (R. at 74-78) and on reconsideration (id. at 81-83).  On March 25, 2003, Stender appealed the denial and filed a request for a hearing.  (Id. at 84.)  A hearing was held before ALJ Leonard A. Nelson in Minneapolis on March 11, 2004, at which Stender was represented by counsel and testified on her own behalf.  (Id. at 16.)  A neutral medical expert ("ME") and vocational expert ("VE") also testified at the hearing.  (Id.)  On June 22, 2004, the ALJ issued his determination that because Stender was not legally disabled, she

was ineligible for disability benefits.  (Id. at 22-24.)

Under Social Security Administration ("SSA") regulations, a disability determination requires a five-step, sequential analysis:  (1) Has the claimant engaged in substantial gainful activity since the alleged onset of disability?  (2) Is the claimant suffering from a severe impairment?  (3) Does the claimant's impairment meet or equal a listing in the Listing of Impairments?  (4) Does the claimant have the residual functional capacity ("RFC") to perform the claimant's past relevant work?  (5) If the claimant is unable to perform past relevant work, is there any other work in the national economy that he or she can perform?  20 C.F.R. § 404.1520.

In the present case, at step one, the ALJ found that Stender had not engaged in gainful employment at any time since her alleged onset date of June 30, 1997.  (R. at 17.)  At step two, the ALJ found that Stender suffered from the severe impairments of MS, degenerative disc disease of the cervical and lumbar spine, and depression.  (Id. (citing 20 C.F.R. § 404.1520(c) and 404.1521).)  ALJ Nelson then compared Plaintiff's severe impairments with the Listing of Impairments set forth in the regulations.  (Id. (citing 20 C.F.R. § 404.1520(d).)  The ALJ also separately considered the impact of Plaintiff's severe mental impairment upon the four broad areas of function, as required by 20 C.F.R. § 404.1520a.   (Id. at 17-18.)  Based upon the record evidence

and the testimony of the ME, ALJ Nelson found at step three that Stender's

impairments, alone or in combination, did not meet or equal the criteria of

any listed impairment for the period of June 30, 1997 to December 31, 2002.

(Id.)

      At step four, ALJ Nelson determined that Plaintiff retained the

RFC to perform unskilled, sedentary work, without exposure to temperature

extremes.  (Id. at 18-19.)  In making this determination, the ALJ evaluated

Stender's subjective complaints under Polaski v. Heckler, 739 F.2d 1320 (8th

Cir. 1984), and its corresponding regulatory provisions.  (Id.)  ALJ Nelson

found Plaintiff's claims to be not fully credible, citing "significant"

inconsistencies in the whole record.  (Id. at 19.)  At this step, the ALJ also

considered Stender's daily activities and past work history, as well as her age

and education.  (Id. at 20.)  At the time, Stender was thirty-four years old,

defined as a younger person, with a twelfth grade education and a varied and

lengthy record of past relevant work.  (Id.)  The ALJ found that Plaintiff could

perform her past unskilled work as an assembler, her most recent job, as this

work was actually performed by her.  (Id.)  Hence, ALJ Nelson concluded that

Stender did not meet the statutory criteria for a finding of disability, and he

did not proceed to step five of the analysis.

      Plaintiff submitted additional evidence on July 12, 2004 and

requested review of the ALJ's decision.  (<u>Id.</u> at 8-12.)  Review was denied on

September 22, 2004, rendering ALJ Nelson's decision as the final decision of

the Commissioner.  (<u>Id.</u> at 8.)  In October 2004, Stender timely filed her case

in federal court.  Plaintiff moved for leave to proceed <u>in forma pauperis</u>, which

was granted.  She filed for summary judgment on February 4, 2005,

challenging the ALJ's findings on three grounds: (1) the RFC assessment was

incorrect because the ALJ failed to properly weigh the opinion of Stender's

treating physician; (2) the RFC assessment was incorrect because the ALJ

improperly discounted Stender's subjective complaints; and (3) the ALJ relied

on an improper hypothetical propounded to the VE.  The Commissioner

received an extension of time in which to file, and moved for summary

judgment on March 21, 2005.  Plaintiff Stender filed a response in opposition

of the Commissioner's Motion on March 23, 2005.

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decision, as embodied

in ALJ Nelson's determination, is limited to an assessment of whether the

decision is supported by substantial evidence in the record as a whole.  42

U.S.C. § 405(g); <u>Brand v. Sec'y of Dep't of Health, Educ., & Welfare</u>, 623 F.2d

523, 527 (8th Cir. 1980).  In determining whether evidence is substantial, the

Court must consider "evidence that detracts from the Commissioner's decision

as well as evidence that supports it." <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). If the Commissioner's decision is based on substantial evidence in the record, the Court may not reverse it merely because other substantial evidence would have supported a different outcome. <u>See</u> <u>Roberts v. Apfel</u>, 222 F.3d 466, 468 (8th Cir. 2000). Further, credibility is weighed by the Commissioner, not the Court. <u>Stephens</u>, 46 F.3d at 39.

With respect to additional evidence submitted to the Appeals Council, such evidence is only relevant insofar as it is new, material, and describes the claimant's condition prior to the date of the Commissioner's decision. 20 C.F.R. § 404.970(b). To this extent, the newly submitted evidence becomes part of the "administrative record," even though the evidence was not actually before the ALJ. <u>Cunningham v. Apfel</u>, 222 F.3d 496, 500 (8th Cir. 2000). If, as here, the Appeals Council has considered the new evidence but declined review, the Court reviews the ALJ's determination to assess whether there is substantial evidence in the administrative record as a whole – which now includes the new evidence – to support the determination. <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 (8th Cir. 1992);

- 6 -

Cunningham, 222 F.3d at 496-500.  The Appeals Council's decision to decline review of Stender's case after considering the new evidence is not appealable. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 42 U.S.C. § 405(g).

## III.   DISCUSSION

As noted above, Plaintiff makes three basic contentions regarding the ALJ's decision: that the RFC assessment was incorrect because the ALJ failed to give the proper weight to Stender's treating physician and improperly discounted Stender's subjective complaints, and that the ALJ utlized an improper hypothetical to the VE.

### A.   The ALJ's Consideration of Stender's Treating Physician

Stender objects to the ALJ's decision to discount the disability opinion of her treating MS physician, Dr. Robert Jacoby.

#### 1.   Operative Record Facts

The medical evidence of record reflects that Plaintiff was involved in a car accident on May 30, 1997, when she was seven months pregnant.  (R. at 184-86.)  At the time, she denied any injuries to herself but sought evaluation of her fetus.  (Id. at 184.)  After the accident, she also reportedly sought the care of a chiropractor for neck manipulation and massage.  (Id. at

220-22, 315.)  At some point in the next weeks,[1] she developed "multiple neurologic symptoms," for which she received follow-up care on July 15, 1997 with Dr. David Dorn, M.D.[2]  (Id. at 220.)  Stender reported that she had occasional episodes of "seeing stars" and feeling light-headed, but that the episodes were neither as intense nor as frequent as before and that she had returned to work.  (Id.)  Plaintiff received an MRI scan of her brain in addition to an MR angiogram.  (Id.)  The MRI was abnormal and revealed several layers of increased signal intensity in eight to twelve areas in the white matter of the corona radiata and corpus callosum of Plaintiff's brain.  (Id.)  Dr. Dorn noted that Plaintiff's symptoms were improving, and opined that her symptoms did not correlate with the MRI results and that her brain abnormalities were unrelated to the car accident.  (Id. at 221-22.)

During an obstetrical check up on July 25, 1997, Stender reported feeling nauseous and dizzy, and seeing stars occasionally.  (Id. at 313.)  She asked if she should cut back on her work, but her physician saw no medical complications that would excuse her from her sedentary job.  (Id.)

---

[1] The record medical evidence is not organized chronologically or otherwise.  The parties fail to reference records for this intervening time period, and the Court found none in its review of the extensive record.

[2] The Court notes that the record evidence shows that Plaintiff's Memorandum in Support of her Motion is erroneous in its chronology and its description of which doctors saw Plaintiff at which time.

Plaintiff saw Dr. Dorn again on July 30, 1997, reporting that she had

experienced past episodes of loss of consciousness or falling, but that her

symptoms had improved.  (<u>Id.</u> at 188.)  Plaintiff still experienced dizzy spells

about once a week, and continued to receive chiropractic treatments.  (<u>Id.</u>)  Dr.

Dorn conducted a lumbar puncture to collect spinal fluid for testing.  (<u>Id.</u>)

220-21.)  The test results were abnormal.  (<u>Id.</u> at 193, 217-18.)  Stender gave

birth shortly thereafter.  (<u>Id.</u> at 195.)

On August 27, 1997, Plaintiff was neurologically evaluated by Dr.

Robert Jacoby, M.D., "to get a second opinion for her evidence of multiple

sclerosis."  (<u>Id.</u> at 217.)  Dr. Jacoby reviewed results of the tests performed by

Dr. Dorn, and concluded that Plaintiff likely did have MS or a demyelinating-

type disease, but that her instant symptoms were not related and not

attributable to that disease.  (<u>Id.</u> at 218-19.)  Dr. Jacoby opined that Plaintiff

had as yet suffered no effects of her MS, and that the car accident caused her

neck pain and headaches.  (<u>Id.</u> at 219.)  Stender returned to Dr. Jacoby on

September 17, 1997, complaining of continuing, although improving,

problems with seeing stars, headaches, and neck pain.  (<u>Id.</u> at 215.)  The

doctor ordered an MRI of her cervical spine (<u>id.</u>), which was performed on

September 23, 1997 (<u>id.</u> at 251).  The MRI revealed a left-sided herniated disc

at C4-5 and C5-6 that compressed the left spinal cord and narrowed the

intervertebral foramina, possibly compressing nerve rootlets.  (<u>Id.</u>)  Stender

returned to Dr. Jacoby on October 15, 1997, reporting ongoing neck pain and

headaches that limited her activities.  (<u>Id.</u> at 213.)  The exam was significant

only for decreased range of neck motion and tightness in the cervical and

paraspinal muscles.  (<u>Id.</u> at 214.)  Dr. Jacoby prescribed anti-inflammatories

and physical therapy.  (<u>Id.</u>)

      Plaintiff had a second child in October 1999.  (<u>Id.</u> at 302-03.)  The

next relevant medical information dates from November 2000.  On November

7, Plaintiff was seen by D. Clarke Tungseth, MD.  (<u>Id.</u> at 246-47; 345-46.)

Stender underwent an MRI of her brain, which was consistent with

demyelinating disease, but which revealed no mass effect, midline shift,

hemorrhage, or hematoma.  (<u>Id.</u> at 246; 345.)  No evidence of tumor or active

MS plaque was detected.  (<u>Id.</u>)  Likewise, no evidence of aneurysm or abnormal

blood flow was detected.  (<u>Id.</u>)  Other than extensive focal areas of increased

signal in periventricular deep white matter that was "suspicious for

demyelinating disease," there were "[n]o other remarkable findings."  (<u>Id.</u>)

      In December 2000, Plaintiff saw her family physician, Dr. James

Carrabre, M.D., complaining of numbness and cold-sensitivity in her right leg.

(<u>Id.</u> at 291.)  Plaintiff then underwent a lumbar MRI that revealed a tiny right

posterior L5-S1 disc herniation with annular high signal intensity.  (<u>Id.</u> at 244;

343.)  The herniation abutted but did not compress or displace the right S1

root.  (Id.)  Additionally, Plaintiff had disc dessication with a bulge and a dorsal

annular tear or granulation tissue at L4-5, and a minimal posterior disc bulge

without herniation at L1-2.  (Id. at 245; 344.)

Plaintiff returned to her MS physician, Dr. Jacoby, in January

2001 complaining of lower back pain and some numbness in her right leg,

which also caused trouble sleeping.  (Id. at 394.)  Plaintiff reported running

around the house after her toddler, and denied any other new medical

difficulties.  (Id.)  Dr. Jacoby noted sensory loss in a femoral nerve distribution

over Plaintiff's right thigh down to her calf, but found "no true weakness."  (Id.)

He also noted that he had not seen Stender for a long time [more than three

years] because she had "been doing very well."  (Id.)  Dr. Jacoby stated that

her MS has "been fairly quiescent," and diagnosed her with possible femoral

neuropathy.  (Id.)  He ordered an MRI of the pelvis (id.), which revealed an

osteochondrom (benign bony growth) rising from the right acetabulum and

producing some mass effect on the adjacent iliopsoas muscle, but no evidence

of mass effect on the expected location of the right femoral nerve.  (Id. at 242-

43.)  A follow up bone scan in February 2001 demonstrated lumbar scoliosis

and no other abnormalities.  (Id. at 241; 342.)

Stender was also evaluated by orthopaedist Robert Barnett, M.D.,

in February 2001 for pain and numbness in her right thigh to knee, with

questionable weakness in her quadriceps.  (Id. at 288-89.)  However, the

doctor found Stender to have active, strong quadriceps with full, pain-free

range of motion in her hip.  (Id. at 289.)  Likewise, an EMG of her legs was

normal.  (Id. at 289.)  Dr. Barnett told Stender that no further medical

evaluation or treatment was needed.  (Id.)

   In March 2001, Stender returned to Dr. Jacoby and reported past,

occasional numbness in her right arm and thigh.  (Id. at 393.)  Plaintiff stated

that her leg pain was gone.  (Id.)  The doctor noted that Plaintiff had no further

difficulties with MS and was doing fairly well, and recounted that the

orthopaedist to whom he referred her for leg pain had found "really nothing

wrong with her."  (Id.)  Dr. Jacoby noted that her MS was stable, but should be

monitored.  (Id.)  In July 2001, Stender received a full physical from her family

physician, Dr. Carrabre, and reported that she was doing well but had some

ongoing symptoms in her right leg.  (Id. at 286.)  In November 2001, Stender

told Dr. Carrabre that she felt anxious and had emotional highs and lows, but

denied being depressed.  (Id. at 283.)  She was given mood-controlling

medication.  (Id.)

   A brain MRI in February 2002 evidenced interval worsening of

Plaintiff's MS.  (Id. at 240, 341, 392, 403.)  Plaintiff went to the emergency

room in April 2002 for facial drooping, generalized fatigue, and pains in her breast, knee, and neck.  (Id. at 207.)  Stender's examination was normal, and the ER doctor could find no cause of Stender's troubles other than a possible relation to her MS.  (Id. at 208-09.)  She was prescribed Prednisone, which helped.  (Id. at 209, 392.)  Plaintiff saw Dr. Jacoby soon after in April 2002, more than a year after her last visit with the MS doctor.  (Id. at 392.)  She reported that her leg pain had gone away significantly, and denied problems with balance, coordination, or cognition and denied any new difficulties.  (Id.) After describing the February 2002 MRI in his notes, Dr. Jacoby stated that Plaintiff was clinically "asymptomatic" of MS, and opined that her prior leg issue was caused by nerve irritation.  (Id.)

At a follow up in June 2002, Stender reported that she did not feel limited, but was relatively more tired when doing things like mowing the lawn.  (Id. at 391.)  She remained "very active with her children" and said that overall things were going fairly well.  (Id.)  Her examination and affect were normal.  (Id.)  Dr. Jacoby started her on preventative medication to slow the progress of MS.  (Id.)  However, Stender did not take her first injection until the end of July 2002.  (Id. at 389.)

In August 2002, she reported to Dr. Jacoby that her pain and hip discomfort had "gone away" and that her mood was better.  (Id.)  The doctor

opined that Plaintiff's prior dizzy spells "sound more like benign positional vertigo than true multiple sclerosis dysfunction," but conceded that the two can be difficult to distinguish. (Id.) Her general exam was unremarkable. (Id.) Also in August 2002, Plaintiff reported to Dr. Carrabre that she had ongoing problems with dizziness and hip pain. (Id. at 276.) An x-ray of her hip revealed some sclerosis, consistent with possible degenerative changes. (Id.) An August 2002 MRI of Stender's brain showed marked interval improvement of her MS symptoms from February 2002. (Id. at 402, 239, 387.) However, after Stender reported worsening dizziness and hearing loss in both ears (id. at 275), another brain MRI was performed in September 2002, which revealed a new tiny focus of enhancement high in the left posterior frontal subcortical white matter, which suggested active demyelination. (Id. at 400, 387, 256.)

Also in September 2002, John P. Vancini, Ph.D., performed a psychological evaluation of Plaintiff at the request of the SSA. (Id. at 258-263.) Stender stated that she experienced increasing tiredness and fatigue, and was unable many days to do regular chores. (Id. at 258.) She reported problems with balance and falling on occasion. (Id.) Stender had depression before being diagnosed with MS, and since, had several cycles of depression and occasional crying spells. (Id.) She denied present suicidal ideation, and

- 14 -

recounted her past history of severe alcoholism.  (Id. at 258-59.)  Plaintiff

described her interests, surrounding her children and home, and her daily

chores.  She stated that she is the caregiver of her toddler son, gets her five-

year-old daughter ready for school, plays with the children and takes them

"places," does the laundry, does all of the family cooking, visits her elderly

neighbor almost daily, enjoys decorating the house seasonally, attends church

and religious classes weekly, mows the lawn, and washes the dishes.  (Id. at

260.)  She said her husband shops for groceries because of her difficulty

lifting.  (Id.)  Stender also stated that has difficulty staying on task for more

than fifteen minutes, because she tires.  (Id.)  Presumably aside from her

neighbor, Plaintiff reported having only a couple of distant friends outside of

her family and in-laws.  (Id.)  Dr. Vancini diagnosed Stender with a mild or

moderate major depressive disorder, with times during which she is not

depressed at all.  (Id. at 261.)  He also diagnosed learning disabilities, and

described her difficulty with basic math, repeating numeric sequences, etc.

(Id. at 261-62.)  The psychologist assigned Stender a Global Assessment of

Function ("GAF") of 55 to 60, emphasizing her limited circle of involvements

outside the home.  (Id. at 262.)  He opined that Stender had an average to

below average general ability, with a history of specific learning disabilities

and associated problems with concentration, persistence, and pace.  (Id. at

263.)  Dr. Vancini remarked on Stender's likeable personality, opining that she would get along well with coworkers, and surmised that her biggest employment difficulties would be fatigue and tiredness.  (<u>Id.</u>)  He had no impression that she was malingering or exaggerating.  (<u>Id.</u>)

In October 2002, Stender reported to Dr. Jacoby that her dizziness had improved and that she "d[id] not have a lot of fatigue," but complained of pain in her hip area.  (<u>Id.</u> at 387.)  Her general exam was unremarkable.  (<u>Id.</u>)  Dr. Jacoby reviewed the notes of Dr. Vancini and noted his concurrence with the psychologist's finding of no evidence of exaggeration or malingering.  (<u>Id.</u> at 387-88, 263.)  Dr. Jacoby also opined that Stender probably minimized her symptoms.  (<u>Id.</u> at 388.)

In June 2003, Dr. Jacoby completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" form, opining that Plaintiff had a good ability to perform nine of the mental work-related listed tasks and a fair ability to perform the remaining six tasks.  (<u>Id.</u> at 416-17.)  The doctor also opined that Stender would be absent from work more than three times per month.  (<u>Id.</u> at 418.)  The following month, Dr. Jacoby partially completed an RFC questionnaire regarding Stender's MS, indicating that she had such extreme functional limitations she was unable to work, and could sit only about two hours and stand or walk less than two hours in an eight-hour work

day.  (<u>Id.</u> at 404-09.)  Dr. Jacoby completed another MS RFC questionnaire in

December 2003, and similarly indicated that Stender had such extreme

functional limitations that she was unable to work.  (<u>Id.</u> at 410-15.)  The Court

notes that the two RFC questionnaires contain many differences in evaluation.

In March 2004, Dr. Jacoby stated that the RFC forms he completed in 2003

were also true for Plaintiff's condition during the operative time of 2002.  (<u>Id.</u>

at 563; 570.)  The doctor failed to indicate which of the differing opinions in

2003 were true in 2002.  (<u>Id.</u>)

### 2.  <u>The ALJ's Decision to Discount Dr. Jacoby's Opinion</u>

Plaintiff contends that in determining her RFC, ALJ Nelson erred

by giving inappropriate weight to the opinion of her MS treating physician, Dr.

Jacoby.  "A treating physician's opinion should not ordinarily be disregarded

and is entitled to substantial weight."  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th

Cir. 2000); <u>see</u> <u>also</u> 20 C.F.R. 404.1527(d)(2) (treating sources' opinions

receive more weight because the sources are "likely . . . most able to provide a

detailed, longitudinal picture" of an impairment).  Moreover, a treating

physician's opinion should be given controlling weight if it is well-supported

by medically acceptable clinical and laboratory techniques and is not

inconsistent with other substantial evidence in the record.  <u>Singh</u>, 222 F.3d at

452; 20 C.F.R. 404.1527(d)(2).  If the opinion is conclusory, that is,

unsupported by clinical or diagnostic evidence, is not entitled to controlling

weight.  E.g., Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).  Additionally,

a treating physician's opinion may be discounted if the opinion is based on a

relatively short-term relationship with the claimant.  See Holmstrom v.

Massanari, 270 F.3d 715, 720-21 (8th Cir. 2001).  When a treating physician's

opinion is itself inconsistent, it receives less deference.  Id. (citations omitted).

Finally, when assessing such an opinion, an ALJ must explain his or her

reasoning.  Id. at 720 (citations omitted); 20 C.F.R. 404.1527(d)(2).

        In discounting Dr. Jacoby's opinion that Stender lacked the RFC

to work, ALJ Nelson stated that he had found the treating physician's RFC

assessment to be largely based on symptoms of MS including fatigue,

weakness, and pain.  (Id. at 21-22.)  However, the ALJ found that the records

of Dr. Jacoby's treatment of Plaintiff prior to February 2003 did not document

a level of severity consistent with the RFC opinion.  The ALJ found that the

operative medical evidence from Stender's date of diagnosis, June 30, 1997, to

her date last insured, December 31, 2002, reflected "only sporadic medical

treatment, denial of debilitating symptoms of fatigue and weakness, no

documentation of ongoing difficulties with balance or gait, indications that the

condition was clinically asymptomatic, and self-reports of a fairly active

lifestyle."  (Id. at 22 (internal citations to the record omitted).)  Citing 20 C.F.R.

404.1527(d)(2), the ALJ concluded that Dr. Jacoby's opinion as it applies to

Stender's condition on or before December 31, 2002, was "not well-supported

by medically acceptable clinical and laboratory diagnostic techniques and []

not consistent with the other substantial evidence in the case record." (Id.)

Stender argues that the ALJ's view of the facts is flawed, and

emphasizes that she "consistently" reported fatigue to Dr. Jacoby and other

doctors between April 2002 and December 31, 2002.  Stender relatedly argues

that the ALJ erred in noting Plaintiff's "self-reports of a fairly active lifestyle,"

because by 2002 she was reporting fatigue and weakness that prevented her

from doing her normal activities.

The Court notes that in 2002, fatigue is noted in treatment

records of April 11 before Dr. Carrabre (R. at 207) and in records of August 23

before Dr. Jacoby (id. at 389).  Likewise, on September 27, Stender told

psychologist Vancini that she was experiencing increasing tiredness and

fatigue that prevented her from doing some housework.  (Id. at 258.)

Conversely, however, on April 19, 2002, Plaintiff saw Dr. Jacoby, complaining

of several problems without mention of fatigue, and denying that she had any

other problems.  (Id. at 392.)  On June 28, Stender reported to Dr. Jacoby

that while she was more "pooped out" mowing the lawn that summer than the

prior, she continued to be "very active with her children," overall things were

going fairly well for her, and that she did not feel limited. (Id. at 391.)

Stender did not report fatigue at visits with Dr. Carrabre on August 2, 7, or 13.

(Id. at 275-76.) At her meeting with Dr. Vancini on September 25, Stender

stated that she is the caregiver of her toddler son, gets her five-year-old

daughter ready for school, plays with the children and takes them "places,"

does the laundry, does all of the family cooking, visits her elderly neighbor

almost daily, enjoys decorating the house seasonally, attends church and

religious classes weekly, mows the lawn, and washes the dishes. (Id. at 260.)

On October 25, Stender reported to Dr. Jacoby that "she does not have a lot of

fatigue." (Id. at 387.) Even looking only at Plaintiff's proffered example of

April to December 2002, the record reflects more claims of an active lifestyle

and no fatigue than claims of debilitating fatigue and weakness. Hence, the

Court finds that substantial evidence in the record supports the ALJ's

determination that the operative medical evidence as a whole shows "denial of

debilitating symptoms of fatigue and weakness" and "self-reports of a fairly

active lifestyle."

While acknowledging that she initially sought only sporadic help

for her MS, Plaintiff challenges the ALJ's reference to "sporadic medical

treatment" during the operative time period by urging a focus on the period of

April through December 2002. (Pl.'s Mem. Supp. Mot. Summ. J. at V.1.A.)

Plaintiff cites some record evidence to show that she received regular care for her MS and increasing symptoms during this time.  The Court's review of the time period's records reveals that Stender sought treatment for MS symptoms at least on April 11 and 19; June 28; August 2, 7, 23, and 29; September 12; and October 25 of 2002.  (Id. at 207, 253, 256, 275, 387, 389, 390, 392, 400, 402.)  With regard to 2002, the Court finds that the ALJ's assessment of Stender's treatment history is not supported by substantial evidence; however, a review of the entire treatment record, as outlined above in section III.A.1., reveals substantial evidence to support the ALJ's conclusion that Stender's overall MS treatment record was sporadic from 1997 through 2002.

Stender also asserts that ALJ Nelson improperly utilized the opinions of non-treating physicians in discounting Dr. Jacoby's opinion that Plaintiff suffered from disabling limitations.  (R. at 21.)  State agency physician Dr. Aaron Mark, M.D., reviewed the record evidence in October 2002 and concluded that Plaintiff could perform a range of medium exertional work.  (Id. at 370-78.)  Another state agency physician reviewed the record evidence in February 2003 and concurred with Dr. Mark's assessment.  (Id. at 377.)  Testifying ME Dr. John LaBree, M.D., reviewed the record evidence and heard Plaintiff's testimony before concluding that Stender could perform full-time sedentary exertional work, provided that she was not required to work in

temperature extremes.  (Id. at 58.)  The ALJ did not adopt the state agency

physician's findings, but rather, found Stender to have additional functional

restrictions that limited her to a range of sedentary work, consistent with the

opinion of ME Dr. LaBree.  (Id. at 21.)

        The opinions of doctors who have not examined the claimant

ordinarily do not constitute substantial evidence on the record as a whole.

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (citation omitted).  While

the opinions of non-treating physicians do not alone constitute substantial

evidence on which an ALJ may base a decision, such opinions used in

conjunction with consistent medical treatment evidence may constitute

substantial evidence.  See Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999).

Given the consistent medical evidence cited above, ALJ Nelson properly

weighed the views of the non-treating physicians and the medical source

opinion of the ME.[3]

_____

        [3] A statement from a medical source about what a claimant can do is
considered medical opinion evidence that an ALJ must consider together with
all of the other relevant evidence when assessing a claimant's RFC.  SSR 96-
5p (ALJs "must always carefully consider medical source opinions about any
issue, including opinions about issues that are reserved to the Commissioner"
but "treating source opinions on issues that are reserved to the Commissioner
are never entitled to controlling weight or special significance." (emphasis
added).)  Issues reserved to the Commissioner include determinations of RFC
and disability.

Further, the Court rejects Plaintiff's contention that the ALJ failed to cite a sufficient amount of record evidence in support of his analysis. Failing to cite specific evidence does not indicate that it was not considered; rather, it may indicate that it was considered and rejected where an ALJ explicitly considered other aspects of the same reports, as the ALJ did here. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).  Likewise, although an ALJ must consider the factors of 20 C.F.R. § 404.1527(d)(2) in evaluating a treating source's opinion, the regulation does not require an ALJ to explicitly discuss each factor.  It is enough that ALJ Nelson explained his legitimate reasons for giving Dr. Jacoby's ultimate conclusion less deference.  See Holmstrom, 270 F.3d at 720-21.

The Court concludes that the ALJ's decision to discount Dr. Jacoby's opinion that Plaintiff could not perform even sedentary work should be upheld.  The ALJ adequately explained that, although Dr. Jacoby was long Plaintiff's treating MS physician, his disability opinion was inconsistent with substantial evidence on the whole record, including Plaintiff's self-reported daily activities in late September 2002, the medical treatment notes of Dr. Jacoby himself and others, and the opinions of the non-treating physicians. See Singh, 222 F.3d at 452.  As the ALJ's decision to discount the treating physician's opinion was adequately explained and supported by substantial

evidence, this Court cannot recommend that the conclusion be overruled,

even if substantial evidence may have supported a different outcome.  <u>See</u>

<u>Roberts</u>, 222 F.3d at 468.  Plaintiff's Motion for Summary Judgment should be

denied in this respect.

### B.    <u>The ALJ's Treatment of Stender's Subjective Complaints</u>

Stender asserts that the ALJ gave her subjective complaints

inappropriate weight in determining her RFC.  A claimant has the burden of

proving that her disability results from a medically determinable physical or

mental impairment, but she need not produce direct medical evidence of the

cause and effect relationship between the impairment and her subjective

complaints.  <u>Polaski</u>, 739 F.2d at 1322.  The ALJ cannot disregard a claimant's

subjective complaints solely because the objective medical evidence does not

fully support them.  <u>Id.</u>  Instead, the absence of an objective medical basis is

just one factor to determine in evaluating the credibility of a plaintiff's

testimony.  The ALJ must give full consideration to other evidence relating to

the subjective complaints, including the claimant's prior work record and

observations by third parties and treating and examining physicians relating

to such matters as: (1) the claimant's daily activities; (2) duration, frequency

and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage,

effectiveness and side effects of medication; and (5) functional restrictions.  <u>Id.</u>

Further, the ALJ may not accept or reject the claimant's subjective complaints

solely on the basis of personal observations.

Subjective complaints may be discounted if there are

inconsistencies in the evidence as a whole, such as discrepancies between

allegations of pain and treatment history, medicinal selections, and daily

activities.  Davis v. Apfel, 239 F.3d 962, 968 (8th Cir. 2001).  Questions of

credibility are for the trier of fact, and a reviewing court should defer to the

ALJ's credibility determinations if the ALJ expressly discounted a claimant's

evidence and gives good reason to do so.  Dixon v. Sullivan, 905 F.2d 237, 238

(8th Cir. 1990).

In the present case, at the fourth step of the sequential analysis,

the ALJ invoked Polaski and the related regulatory framework, and stated that

he had evaluated the entire record, including Plaintiff's testimony, under that

framework.  (R. at 18-21.)  Finding significant inconsistencies in the record,

the ALJ concluded that Stender's assertion that she was incapable of all work

activity was not credible.  (Id. at 19.)  Plaintiff argues that the ALJ failed to

properly evaluate the credibility of her subjective complaints.

## 1.    **Prior Work Record**

In evaluating Plaintiff's prior work record, ALJ Nelson remarked

that, to her credit, Stender had a record of consistent employment through

1997.  (R. at 20.)  However, the ALJ noted that Plaintiff testified she ceased

working in 1997 due to her pregnancy and a motor vehicle accident, and that

she did not allege that her employment ended due to the symptoms of her

impairments.  (<u>Id.</u>)  Plaintiff now argues that she testified to the contrary.  The

hearing transcript reveals that in response to the VE asking her why she left

her job in 1997, Stender replied, "I had a car accident."  (<u>Id.</u> at 63-64.)  The VE

said "Okay," and Stender continued, "Seven months pregnant."  (<u>Id.</u> at 64.)

She then said, "That's where they found out I had MS and everything."  (<u>Id.</u>)

The VE asked whether she ever considered going back to work once she had

recovered from the car accident, and Stender said, "I believe I did after for

about two weeks to a month and then I just started having dizzy spells and

then I said, forget it."  (<u>Id.</u>)  The VE then confirmed that Plaintiff was still

pregnant when she attempted to return to work.  (<u>Id.</u>)  The Court finds that

the transcript's ambiguities could lead one to reasonably believe that Stender

left her job because of her car accident and pregnancy, particularly

considering the fact that Stender's physicians remarked several times that her

symptoms of dizziness, etc., at that point in time were unrelated to her

diagnosis of MS.

          ALJ Nelson also noted the long periods of time since 1997 when

Stender was asymptomatic but did not attempt to work or to receive any

vocational or rehabilitation training to assist with employment.  (R. at 20.)  The

ALJ concluded that the record did not suggest a significant effort to return to

work.  (Id.)

        The fact that a claimant ceased working for reasons unrelated to

her impairments does not enhance the credibility of an assertion that

disability prevents work.  See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.

1994).  Also, given the record evidence that Plaintiff did not attempt to return

to work or receive training after the birth of her first child in 1997, despite

long periods of time during which she was asymptomatic, the Court finds that

substantial evidence supports the ALJ's conclusion that Stender's prior work

history cuts against her credibility.

## **2.**    **Daily Activities**

        Evidence that daily activities are inconsistent with the alleged

level of pain may be considered in judging the credibility of subjective

complaints.  See Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1995);

Shannon v. Chater, 54 F.3d 484, 487 (8th Cir. 1995).  ALJ Nelson discussed

Stender's self-reported activities as of late September and October 2002,

during the period at issue, noting her range of self-sufficient daily exertions.

(R. at 20.)  As discussed above, at the time, she reported she was the caregiver

of her toddler son, gets her five-year-old daughter ready for school, plays with

the children and takes them "places," does the laundry, does all of the family

cooking, visits her elderly neighbor almost daily, enjoys decorating the house

seasonally, attends church and religious classes weekly, mows the lawn, and

washes the dishes. (<u>Id.</u> at 20, 260.) She did state that she was unable to do

the lifting necessary for grocery shopping. (<u>Id.</u>) On October 25, Stender

reported to Dr. Jacoby that "she does not have a lot of fatigue." (<u>Id.</u> at 20,

387.) The ALJ also noted that Plaintiff's husband worked full time and there

was no indication that she needed assistance during the day when she was

home alone with her small children. (<u>Id.</u> at 20.)

However, the ALJ did discuss Plaintiff's testimony at the March

2003 hearing that she has "bad days" nearly every other day, during which

she is significantly limited in her ability to perform daily life activities. (<u>Id.</u> at

20, 35-38, 40-42, 46-47, 52-53.) She testified that she was still able to care

for her own bathing, feeding, and dressing. (<u>Id.</u> at 38.) She also testified that

her descriptions of current debilitating limitations every other day were true

for 2002 as well. (<u>Id.</u> at 53, 54.) However, the Court notes that at various

points during the hearing, Stender remarked that her condition had recently

much worsened, making her assertion with regard to the critical time period

prior to 2003 less convincing. The Court finds the ALJ's determination that

Plaintiff's level of daily activities was inconsistent with her allegations of total

disability to be supported by substantial evidence in the record.  See Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987).

### 3.   Duration, Frequency, and Intensity of Pain

In assessing subjective complaints of pain, the issue is how severe the pain is, even though there may be no doubt that the claimant experiences pain.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  ALJ Nelson noted that Stender testified that she was limited due to severe neck and back pain and headaches.  (R. at 19.)  The ALJ also noted that the medical evidence revealed a documented cervical disc herniation in September 1997, a "tiny" posterior disc herniation with no nerve root compression or displacement in December 2000, and confirmed lumbar scoliosis but no other abnormalities in February 2001. (Id.)  Despite Stender's allegations of incapacitating pain, the ALJ remarked that the record did not indicate significant evaluations of or treatment for pain, ongoing use of narcotic medication, referrals to a pain clinic, use of a TENS unit or other modality to control pain, epidural or steroid injections, or discussion of possible surgical procedures.  (Id.)  Hence, the ALJ found Stender's complaints of pain to be less than fully credible.

A failure to seek professional help for alleged pain may be considered inconsistent with subjective complaints of disabling pain.

<u>Benskin</u>, 830 F.2d at 884.  Additionally, a plaintiff's apparent ability to function without strong pain medication is inconsistent with subjective complaints of disabling levels of pain.  <u>Richmond v. Shalala</u>, 23 F.3d 1441, 1443-44 (8th Cir. 1994); <u>Murphy</u>, 953 F.2d at 386.  Accordingly, the Court finds that substantial evidence supports the ALJ's finding in this regard.

## 4.      **Precipitating and Aggravating Factors**

The ALJ found that the record supported a limitation on Plaintiff's RFC regarding the aggravating factor of exposure to extremes of heat and cold. (R. at 19.)

## 5.      **Dosage, Effectiveness, and Side Effects of Medication**

In addition to Plaintiff's lack of strong pain medication, ALJ Nelson also discussed medication in the context of Plaintiff's ongoing symptoms of depression.  He noted that Plaintiff's symptoms improved but did not fully abate with the use of the medication Celexa, and emphasized that during the period adjudicated Stender did not request any changes in her medication.  (<u>Id.</u> at 19-20.)  On this final point, the ALJ was incorrect. Plaintiff's antidepressive medication was altered by her MS doctor in November 2002 in an effort to find a more effective drug.  (<u>Id.</u> at 387.)  No side effects are noted with regard to the antidepressives.

The ALJ also stated that Plaintiff had begun Avonex therapy in July 2002 for the treatment of her MS.  (<u>Id.</u> at 20.)  At the hearing, Stender testified to significant side effects secondary to Avonex, including flu-like symptoms and fatigue.  The ALJ noted, however, that after four months of treatment and during the period of adjudication, in October 2004, Plaintiff reported to her treating physician [Dr. Jacoby] that she did not have a lot of fatigue, and failed to report significant side effects.  (<u>Id.</u>)  As correctly noted by the ALJ, where a claimant took no steps toward obtaining different medications, the Commissioner may reasonably infer that the claimant was satisfied with the effects of the present medications.  <u>See</u> <u>Chamberlain v. Shalala</u>, 47 F.3d 1489, 1495 (8th Cir. 1995).

### 6.  <u>Functional Restrictions</u>

As noted in part III.B.4., <u>supra</u>, the ALJ found Stender's complaints regarding temperature extremes to be credible, and limited her RFC to exclude exposure to extreme heat or cold.  As discussed in III.A.2., <u>supra</u>, based in part upon ME Dr. LaBree's testimony, ALJ Nelson found that Plaintiff could perform a sedentary level of work.

### 7.  <u>Conclusion</u>

This Court finds that the <u>Polaski</u> factors overall support the ALJ's finding that Plaintiff's subjective complaints were not wholly credible.  While

Stender "was clearly experiencing some discomfort, her testimony about her daily activities, as well as the lack of any prescriptions for strong pain medication, supports the ALJ's decision that her testimony was not credible." See Murphy, 953 F.2d at 386.  Stender's work history and her failure to seek aggressive pain treatments during the time period at issue further support the ALJ's conclusions.  See Barrett, 38 F.3d at 1023 ("a failure to seek aggressive treatment is not suggestive of disabling back pain") (quoting Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988)).  Especially considering the deference due to an ALJ's credibility determinations, the Court recommends that in reaching his finding of non-disability, the ALJ properly weighed Plaintiff's subjective complaints.  See Stephens, 46 F.3d at 39.  Plaintiff's Motion for Summary Judgment should not be granted on this basis.

### C.    The ALJ's Hypothetical to the VE

Finally, Plaintiff Stender challenges the ALJ's use of the VE.  At the hearing, ALJ Nelson propounded a hypothetical to neutral VE Steven Bosch asking whether Plaintiff could perform her past relevant work if she were limited to sedentary work without exposure to temperature extremes. (R. at 65.)  The VE opined that Stender could return to her last job, performed from 1996 to 1997, as a sedentary small parts assembler.  (Id.)  In response to a question by the ALJ, VE Bosch noted that Stender would be permitted no

more than two unexcused absences per month at that position.  (Id.)

Citing medical evidence from six months after Plaintiff's date of last insured, her attorney asked the VE whether a person seriously limited in her ability to deal with work stresses, function independently, maintain attention and concentration, and behave in an emotionally stable manner would be able to perform any job that exists in the national economy.  (Id. at 66.)  The VE responded that if those limitations prevented a person from performing a task at hand on a consistent eight-hour-a-day basis, she would not be able to sustain competitive employment.  (Id. at 66, 67-68.)  Stender's attorney also pointed to a claim by Plaintiff in October 2002 that she was able to work for only two hours before needed rest, and the VE confirmed that such a limitation would prevent full-time employment.  (Id. at 66-67.)  The VE also agreed that, in general, a person needing more frequent or deviated break times in an unskilled, assembly-type job would be unable to perform the job.  (Id. at 67.)  Finally, the VE confirmed that if a person were able to stand and walk less than two hours and sit for two hours per day, she would be unable to perform full-time competitive employment.  (Id. at 68.)

Testimony from a VE based on a proper hypothetical constitutes substantial evidence.  Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).  The converse is also true.  See Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996).

Where a hypothetical question posed to a vocational expert does not accurately reflect the claimant's impairments, the expert's testimony cannot constitute substantial evidence on the record as a whole. <u>Pratt v. Sullivan</u>, 956 F.2d 830, 836 (8th Cir. 1992) (citations omitted).

The Commissioner asserts that the hypothetical put to VE Bosch constitutes substantial evidence supporting the ALJ's decision because it included all of Plaintiff's credible limitations through December 31, 2002.  In other words, because the ALJ properly discounted Dr. Jacoby's opinion and properly found Stender's claims of total disability to be less than fully credible, the ALJ did not err by omitting elements of her physician's opinion or her subjective claims from the hypothetical.  The Commissioner also emphasizes that because the ALJ decided Plaintiff's claim at the fourth step of analysis by finding that she could perform her past relevant work as an assembler, he was not even required to obtain VE testimony, and the burden of production never shifted from Plaintiff.  <u>See</u> 20 C.F.R. § 404.1560; <u>Barrett</u>, 38 F.3d at 1024.

The Court agrees that Stender's final argument is entwined with her others.  Having recommended that Plaintiff's Motion for Summary Judgment fails because the ALJ's decisions regarding the weight of Dr. Jacoby's testimony and the credibility of Stender were supported by

substantial record evidence, the Court recommends that for all of the reasons

outlined above, the ALJ did not err in utilizing the unnecessary hypothetical

to the VE.  Plaintiff's claim for summary judgment should be denied in this

respect.


        In sum, the Court recommends that Plaintiff has shown no

grounds for reversal or remand of the Commissioner's final decision of non-

disability.  Based on the foregoing, and all the files, records, and proceeding

herein, **IT IS HEREBY RECOMMENDED**:

        (1)    Plaintiff Susan A. Stender's Motion for Summary Judgment

(Doc. No. 10) should be **DENIED**;

        (2)    Defendant Commissioner's Motion for Summary Judgment

(Doc. No. 16) should be **GRANTED**; and

        (3)    The Commissioner's decision should be **AFFIRMED**.


Dated: August 5, 2005

                          s/ Jonathan Lebedoff
                         JONATHAN LEBEDOFF
                         Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court and serving all parties by
August 24, 2005, a copy of specific, written objections.  A party may respond
to the objections within ten days after service thereof.  All objections and
responses filed under this rule shall not exceed 3,500 words.  A District Judge

shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.